THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JOHNNIE NUNN, Defendant-Appellant.

First District (5th Division)    No. 79-1890

Opinion filed November 20, 1981.

Ralph Ruebner, of State Appellate Defender's Office, and William R. Hogan, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mark E. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a bench trial, defendant was convicted of one count of armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 18—2) and three counts of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4), and sentenced concurrently on all counts to 10 years' imprisonment. He appeals and contends as follows: (1) the trial court erred in failing to suppress his post-arrest statement elicited in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the pretrial identification procedures employed by the police were unnecessarily suggestive and violated his due process rights; and (4) the trial court erred in sentencing him to concurrent terms of 10 years' imprisonment for each count charged where the offenses were part of the same act or transaction, and were not "independently motivated" or otherwise separable.

The following pertinent testimony was adduced at trial.

Enzio Primer testified that on April 28, 1978, he left work at 4 p.m. and went to a currency exchange to cash his paycheck. He then went to a tavern at the corner of Oakley and 13th Street in Chicago, where he had a "couple of beers." After about an hour, Primer left the tavern, stopped at his home, and proceeded to a friend's home located at Cicero and Polk Street. While there, he shared a pint of liquor with his friend. At 11 p.m., he departed for a tavern on Kedzie Avenue between 15th and 16th Streets, where he had a shot of whiskey and two beers. He returned to his home at 1549 S. Kedzie Avenue at around 2 a.m.

An hour later, he left his home to buy some cigarettes at a service station at 16th and Sawyer, about one block away. On the way there, Primer saw two men standing in front of a tavern on Kedzie Avenue named "Bucket of Blood." He recognized one of the men as "Weaver," who had previously lived across the street from him. He identified Weaver in court as the defendant. As he returned from the service station, he noticed that the two men were still standing in front of the tavern.

When he stopped at an empty lot near his home to open the cigarettes, he was "slugged" on the back of the head, knocked to the ground and stabbed in the back. He had $24 in his wallet and $40 in his shirt pocket. Someone removed the wallet, but he was unable to see the assailant since he was lying on his face. While he was on the ground being stabbed, Weaver asked Primer where the rest of his money was. At this juncture, someone yelled, "Leave that man alone," and the two men fled. Weaver ran down Kedzie Avenue toward 16th Street.

Primer got up and walked to his home. Shortly thereafter, he returned to the scene of the crime with a flashlight. After he found his keys and empty wallet on the ground, he went to another friend's home, and they called an ambulance. Before the ambulance arrived, Carrie Nunn, defendant's mother, came to Primer's house. He told her that her son had just stabbed and robbed him. The ambulance took him to Mt. Sinai Hospital, and he was later taken to Cook County Hospital.

While Primer was in the hospital, he was shown a group of six photographs by a police officer. He identified one of the pictures as that of defendant. At trial, he picked out the same picture of defendant.

On May 3, 1978, after a five-day stay at the hospital, Primer was brought by a police officer to the police station. He and the officer walked into a room where defendant was being held. Primer stated to him, "Man why do you do something like this to me?" According to Primer, defendant responded that he "didn't know it was me [Primer] and he wasn't intending to do it to me."

Investigator Thomas Konczal of the Chicago Police Department testified that on May 1, 1978, he spoke with various residents in the vicinity of the attack and obtained a photograph of defendant from the police files. Then, he brought this photograph along with five others to the hospital and displayed them to the victim. Konczal corroborated Primer's testimony that the latter selected defendant's picture as the person who robbed him on April 29, 1978.

Investigator James Gruber of the Chicago Police Department testified that he arrested defendant in a pool hall on May 3, 1978. On the way to the police station, he informed defendant of his *Miranda* rights. Defendant stated that he understood these rights.

At the station, defendant was placed in a second floor interview room and handcuffed to a ring on the wall. Gruber readmonished defendant of his *Miranda* rights. Defendant stated that he understood his rights, but asked the reason for his arrest and demanded to be confronted by his accuser. Gruber picked up Primer at the hospital, and told him that an arrest had been made and that he wanted him to view someone. When Gruber brought him into the interview room at the police station, Primer immediately asked defendant, "Why did you do this to me?" Defendant

replied, "Man, I didn't know it was you we cut." Primer and Gruber then left the room.

Carrie Nunn testified on defendant's behalf that at the time of the crime she lived at 3153 West 16th Street with defendant, her son. After the attack, she saw Primer standing in front of his house. Primer told her: "Your son saved my life." He then told her that another man attacked him with a knife and that "if it wasn't for Weaver, he would have killed me." According to Nunn, Primer never told her that defendant struck him or took money from him.

Defendant testified on his own behalf that in the early morning hours of April 29, 1978, he went to his girlfriend's house at 3145 W. 15th Place. As he was passing a vacant lot on the way there, he heard a struggle and ran over and pulled a "stud" off Primer. Defendant had never seen this assailant before and saw no knife in his possession. The person fled and defendant continued on to his girlfriend's house. Primer remained on the ground.

Later, when defendant was arrested and brought to the police station, he denied having any conversation with the police. Primer was brought into the second floor room where he was being held and defendant said to him: "Mr. Primer, I didn't know it was you the stud robbed back there." Then, according to defendant, the police took Primer out of the room and "* * * told him [Primer] me and him don't need to be talking."

Defendant denied robbing or striking Primer or assisting anyone in doing so. Defendant, 21, had known Primer since he was 14 years old, had been to his home on several occasions and had spoken with him over drinks. On the night of the crime, defendant denied standing in front of the "Bucket of Blood" tavern, although he saw several other people congregated in the area. He did not know that Primer was the victim of the attack, and he left the victim on the ground since he "thought he was all right."

OPINION

Defendant first contends that the statement he made in the interview room of the police station when confronted by the victim was obtained in violation of his constitutional right to silence under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and that its admission into evidence constitutes reversible error.

Prior to trial, defendant filed a motion to suppress statements. At the hearing on the motion, Investigator Gruber testified that after he arrested defendant, he informed him of his *Miranda* rights. Defendant stated that he understood these rights. Gruber asked defendant if he wished to make a statement, and defendant replied, "No." Defendant was again admon-

ished of his *Miranda* rights at the police station. While in the interview room at the station, defendant demanded to be confronted by his accuser. Primer was brought into the room and immediately asked defendant why he had attacked and robbed him. Defendant replied: "Man, I didn't know it was you we cut." According to Gruber, this confrontation was arranged at defendant's request. Gruber asked no questions of defendant, nor did Primer ask Gruber if he could speak to defendant. The trial court denied defendant's motion to suppress.

In order to determine whether a violation of defendant's constitutional rights occurred in this case, we start with the proposition that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of an accused unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602). It is clear from the record that defendant was admonished of his *Miranda* rights and that he understood these rights. After being so admonished, defendant indicated to Investigator Gruber that he did not wish to make a statement. Once an individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. (*Miranda*.) The question in this case thus becomes whether the conduct of the police in arranging the confrontation between defendant and the victim which led to the incriminating statement constitutes "interrogation" under *Miranda*.

In *Rhode Island v. Innis* (1980), 446 U.S. 291, 64 L. Ed. 2d 297, 100 S. Ct. 1682, the United States Supreme Court held that *Miranda* safeguards come into play whenever a person in custody is subject to either express questioning or its "functional equivalent." The court stated that:

"* * * [T]he term 'interrogation' under *Miranda* refers not only to express questioning, *but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.*" (Emphasis added.) *Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308, 100 S. Ct. 1682, 1689.

In *Innis*, defendant was admonished of his *Miranda* rights after his arrest for armed robbery. He stated that he understood his rights and wanted to speak with an attorney. While enroute to the police station in a squad car, two police officers engaged in a conversation between themselves in defendant's presence concerning the missing shotgun used during the commission of the crime. One of the officers stated that there were several handicapped children in the area, and expressed a fear that one might find the weapon with shells and harm himself. Defendant interrupted the conversation and told the officers to turn around the car so that he could lead them to the shotgun. At the scene of the arrest,

defendant was readmonished of his *Miranda* rights, and stated that he understood these rights, but feared for the safety of the children. He then led the police to the gun. The court held that under these facts, defendant was not "interrogated" in violation of his right under *Miranda* to remain silent. According to the court, there was no express questioning of defendant since the conversation between the two officers was a dialogue inviting no response from defendant. Moreover, it was found that defendant was not subjected to the "functional equivalent" of questioning because the officers could not have known that their conversation was reasonably likely to elicit defendant's incriminating response. In so ruling, the court noted that there was nothing in the record suggesting that the officers were aware that defendant was particularly susceptible to an appeal to his conscience concerning the safety of handicapped children, or that they knew that defendant was unusually disoriented or upset at the time of his arrest.

■■ The rationale of *Innis* is equally applicable here. Once defendant indicated after receiving *Miranda* warnings that he wished to remain silent, his questioning ceased. The victim was later brought to the interview room as a result of defendant's request to confront his accuser. The police officer said nothing to defendant at the confrontation, nor is there any evidence that he instructed the victim to speak to defendant. In addition, nothing in the record indicates that defendant was unusually disoriented at the time of the confrontation, or that he was particularly susceptible to the type of unforeseen statement made by the victim. Under these circumstances, we do not believe that the police officer's conduct in arranging this confrontation was reasonably likely to elicit an incriminating response from the defendant. Thus, defendant's spontaneous reply to the victim's outburst was not the product of police "interrogation" or its "functional equivalent," and its admission into evidence was proper.

Cases cited by defendant from other jurisdictions in support of its position that interrogation occurred in this case are distinguishable and unpersuasive. (*People v. Bodner* (1980), 75 App. Div. 2d 440, 430 N.Y.S.2d 433; *In re Durand* (1980), 206 Neb. 415, 293 N.W.2d 383.) In *Bodner*, the 17-year-old retarded defendant told the police that his cousin had started several fires in the area. After checking out the cousin's alibi, the police confronted defendant with the untruthfulness of his statement. He then made an incriminating response. In *Durand*, a police officer did not cease conversation with defendant after he indicated his desire to remain silent. Instead, the officer showed him police reports of unsolved burglaries for which he was suspected. A short time later, defendant made a statement implicating him in a theft of money. The police conduct

in each of these cases was held to constitute interrogation or its functional equivalent as defined under *Innis*. Yet, such conduct is plainly distinguishable from that in the present case. Unlike the situation in *Bodner* and *Durand*, the confrontation at bar was instigated by defendant. In addition, the victim did not ask to see defendant nor was he instructed by the police to say anything to him at their meeting. Therefore, it cannot be said that defendant was subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

Defendant next contends that the State failed to prove his guilt beyond a reasonable doubt. This claim is premised upon defendant's belief that his incriminating pretrial statement was admitted into evidence in violation of his constitutional rights, and that the victim's identification of him as one of the assailants was unreliable. We have already decided that the statement was properly admitted into evidence. Therefore, we turn to the defendant's arguments concerning his alleged misidentification.

According to defendant, the victim's initial identification of him stemming from the recognition of his voice at the scene of the crime was so inherently unreliable that it raises substantial doubts as to his guilt. ■■ Identification by voice is permissible and may establish defendant's guilt beyond a reasonable doubt. (*People v. Kennedy* (1975), 33 Ill. App. 3d 857, 338 N.E.2d 414.) This manner of identifying an accused goes only to the weight of the identification testimony, which is to be evaluated by the trier of fact. (*People v. Finney* (1967), 88 Ill. App. 2d 204, 232 N.E.2d 247, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2304.) We believe that the voice identification in the present case was reliable and supports defendant's conviction. Although Primer never saw the face of either of the assailants at the time of the attack, he recognized defendant's voice when he asked Primer where the rest of his money was. Primer had known defendant, a neighbor of his, for over five years. They visited each other's homes on several occasions, spoke with each other and had drinks together. We are aware of the victim's testimony that he drank a considerable amount of alcohol on the night of the crime. The trial court, of course, was obligated to consider Primer's physical condition at the time the identification was made. However, the credibility of the witnesses and the weight to be given their testimony is for the trier of fact. (*People v. Green* (1978), 62 Ill. App. 3d 420, 379 N.E.2d 119.) We decline to substitute our judgment for that of the trial judge, who was able to observe the demeanor of each of the witnesses, concerning their credibility. We believe that the victim's identification of defendant was reliable due to the past relationship between the two, which provided an

opportunity for Primer to become familiar with defendant's voice. The manner of identification was not so improbable as to raise a reasonable doubt as to defendant's guilt.

Defendant points to alleged inconsistencies in Primer's testimony in an effort to establish that it was vague and uncertain. For instance, on cross-examination, Primer stated that he had never had any "personal contacts" with defendant and could not recall when they last spoke to each other before the attack. Our reading of the transcript reveals that defendant was apparently initially confused by the term "personal contacts," but later stated that he had seen and spoken to defendant on several occasions. At first glance, there also appears to be some minor confusion in Primer's testimony as to how he was transported to the hospital. While Primer stated he went in an ambulance, Investigator Konczal's report indicated that the police took him there. A close reading of the record, however, shows that no contradiction in Primer's testimony actually exists since the police accompanied him to the hospital in the ambulance. Finally, defendant maintains that Primer's testimony was uncertain regarding the amount of money that he had when he was robbed. Primer first testified that he had $64 when attacked and that he had spent the rest of his money (a paycheck for over $100) on alcohol. He later stated that he had put some of the money in the house. Yet, this testimony is not necessarily inconsistent, since Primer may have referred to his "money" in the first instance as that which he spent that night instead of the remainder of his paycheck. In any event, we hold that any discrepancies in Primer's testimony in this regard were minor and did not render it unworthy of belief.

Defendant next maintains that the erroneous voice identification by Primer led to the photographic identification procedure, which was conducted under suggestive circumstances.

Prior to trial, defendant moved to suppress the photographic identification testimony. No testimony was presented on the motion. Defense counsel argued to the trial court that the array of six pictures shown to defendant was suggestive since two of the six pictures contained therein were of white males even though the assailant had been identified as a black male. Also, defendant's photo had a handwritten identification record (IR) number on it, differing from the magnetic block numbers portrayed on the other suspects' pictures. The trial court denied the defendant's motion to suppress.

Initially, we note that the supplemental record filed with this court shows that all six of the photographs in the display depict black males. We are, therefore, at a loss to understand the basis of defendant's assertion that two of the photographs were of white males. Nevertheless, even if only four of the pictures were, indeed, of black males, we find that the array was not unnecessarily suggestive.

■■ Convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Each case involving photographs must be considered on its own facts. (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) In *Witted*, the court found a photographic display of 25 pictures not to be suggestive where defendant's photo was the only one in the group without any writing on it and with only a single view rather than two views. Likewise, the court in *People v. Hart* (1973), 10 Ill. App. 3d 857, 295 N.E.2d 63, ruled that the photographic procedure was not so improper as to require reversal even though defendant's picture was larger than the four others, and his was the only one with a date written on it. Certainly, the photographic display in this case is no more suggestive than those in *Witted* and *Hart*. Moreover, it is very unlikely in this case that the photographic identification procedure led to an irreparable misidentification since the victim knew defendant for several years prior to the attack. Thus, defendant's motion to suppress the identification testimony was properly denied.

Defendant also contends that the confrontation he had with the victim in the interview room of the police station was unnecessarily suggestive and reinforced the earlier photographic identification of him as the assailant. It is defendant's belief that his identification at trial was fatally tainted by this pretrial confrontation.

■■ An in-court identification is admissible regardless of the suggestiveness of pretrial identification procedures when from the totality of the circumstances it is shown by clear and convincing evidence that the identification was based on observations of the defendant other than during the arguably improper pretrial identification. (*People v. Lomax* (1980), 89 Ill. App. 3d 651, 411 N.E.2d 1212.) Where the person identified is known to a witness prior to the crime, the identification by that witness is not influenced by any pretrial confrontation. (*People v. Mueller* (1973), 54 Ill. 2d 189, 295 N.E.2d 705, *cert. denied* (1973), 414 U.S. 1044, 38 L. Ed. 2d 335, 94 S. Ct. 549; *People v. Kane* (1980), 81 Ill. App. 3d 641, 401 N.E.2d 1310.) It is evident from the facts of this case that the victim's identification of defendant at trial was not influenced by their confrontation at the police station since the two had known each other for several years prior to the crime. Therefore, the in-court identification had an independent origin and was properly admitted at trial.

In summary, we hold that the victim's identification of defendant as one of the assailants was neither influenced by the pretrial photographic display nor the confrontation at the police station. Rather, the identification stemmed from the victim's recognition of the voice of defendant, his

former neighbor, at the time of the incident. Moreover, although the victim had not seen the face of either of the two men at the time of the attack, he observed defendant and another man near the scene of the crime shortly before it occurred and saw defendant run down the street afterwards. When this identification testimony is coupled with defendant's incriminating statement at the police station, there can be no reasonable doubt as to his guilt.

■■ It is of no significance that the victim did not see which of the assailants actually stabbed him and which removed his money. Clearly, defendant is legally accountable for the acts of his accomplice since both were active participants in the crimes. Defendant's arguments that the evidence, at best, merely establishes his presence at the scene of the crime, is without merit. Suffice it to say that defendant's question to the victim during the crime concerning where the rest of his money was, and his later manifestation of surprise that Primer was the person that he and his accomplice had "cut," convincingly demonstrate that he was not just an innocent passerby.

Finally, defendant contends that the trial court erroneously sentenced him on the charges of armed robbery and aggravated battery, since both arose out of the same actions and are not "independently motivated" or otherwise separable. We disagree.

■■ When more than one offense arises from a series of incidental or clearly related acts and they are not, by definition, lesser-included offenses, multiple convictions with concurrent sentences may be entered. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) The "independent motivation" test, relied upon by defendant as a standard for determining whether multiple convictions and concurrent sentences may stand, has been specifically rejected by our supreme court. (*King.*) More specifically, it has been held that concurrent sentences can be properly entered upon convictions for both armed robbery and aggravated battery. (*People v. Higgins* (1979), 71 Ill. App. 3d 912, 390 N.E.2d 340; *People v. Olmos* (1978), 67 Ill. App. 3d 281, 384 N.E.2d 853.) Because each of defendant's offenses arose from separate acts (*i.e.*, knocking the victim down, stabbing him and removing his money), his convictions and concurrent sentences are proper.

Accordingly, for the reasons stated, the judgment of the circuit court is hereby affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.