THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HAROLD WILSON, Defendant-Appellant.

First District (5th Division)    No. 82—3028

Opinion filed June 1, 1984.

Steven Clark and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Nicholas Geanopoulos, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a bench trial, defendant was convicted of rape, deviate sexual assault and armed robbery and sentenced to concurrent terms of 40 years for rape, 40 years for deviate sexual assault and 20 years for armed robbery. On appeal, he contends that (1) he was denied due process by the trial court's failure to order a fitness hearing; (2) the psychiatric reports finding him fit to stand trial did not comply with the statutory requirements therefor; (3) his incriminating statements should have been suppressed because they were obtained before *Miranda* warnings were given; and (4) his sentences were excessive. As there is no contention that guilt was not established, we will set forth only the evidence relevant to the issues presented.

In December 1980, defense counsel requested a pretrial psychiatric examination, informing the trial court that defendant had been found incompetent in a 1978 criminal proceeding. An examination by the Psychiatric Institute of Cook County was ordered and the report thereof concluded that defendant was fit to stand trial and had been legally sane at the time of the offense. In March 1981, the trial court denied a motion of defendant that he be transported to Great Lakes Naval Training Center for a psychiatric evaluation on the basis of documents indicating that he had received a disability discharge from the Air Force in 1976 after a diagnosis of acute manic-depressive illness. In September 1981, the trial court denied another motion of defendant that he be examined by a private psychiatrist but the court did order an updated examination by the Psychiatric Institute, the findings of which were the same as those in the examination performed in December 1980.

Thereafter, at the pretrial hearing on defendant's motion to suppress statements, Deputy Sheriff Allen Hudson (Hudson) testified that he was at a lounge with complainant, her husband and Robert Rockymore (Rockymore) when complainant pointed out defendant as one of the men who had raped her a week before. Hudson approached the defendant, displayed his badge, informed him that he was a deputy sheriff and asked him to step outside whereupon he and Rockymore led defendant to a vacant lot next to the lounge to move him away from the patrons exiting the front door and searched him. After the police were called, complainant's husband came out to the lot and questioned defendant while he (Hudson) stood between the two men. By then, a number of people, including some of defendant's friends, had gathered and were "screaming various things." Hudson acknowledged that defendant was not free to leave and that he had not advised him of his constitutional rights, but stated that the only question he asked of defendant was his name. The complainant's husband corroborated Hudson's testimony and stated also that Hudson neither told him to ask defendant any questions nor directed defendant to answer any. Rockymore further added that the complainant's husband was very excited and that Hudson was "just trying to keep [him] cool."

Defendant testified that he was at the lounge with his girlfriend, Shirley Williams (Williams), when two men, one of whom had a badge, grabbed him and took him to a vacant lot next to the lounge where they and several other men hit him and questioned him about a rape. It was only after the men knocked him to the ground and threatened him that he gave them a name. Williams, whose testimony

was essentially the same as defendant's, added that at defendant's request she called his sister and upon returning to the lot, heard the men, including the one with the badge, asking defendant for the name of his partner. Defendant's sister testified that when she arrived, she observed her brother lying on the ground in the midst of a group of men who were all asking him questions.

Defendant's motion to suppress was denied, and at trial, complainant's mother testified that at about 5:30 a.m. on September 20, 1980, when her daughter came to her apartment, her face was bruised, her clothing was in disarray and she said that she had been raped.

Complainant, an elementary school teacher, testified that at about 3:30 a.m. she was walking toward her mother's house after returning from a party when she noticed some people leaving a bar. As she entered the outer hallway of her mother's building, two men came up behind her and pushed her up against the mailboxes inside. One of them grabbed her earrings and wedding rings and tore three gold chains from her neck. The other man, whom she identified as defendant, hit her in the face and threatened her by placing a knife to her neck. She was told to unlock the inner door which she did and they then led her to the landing in the hallway where they ordered her to undress. During the next two hours, defendant hit her 15 to 20 times and both men forced her to perform deviate sexual acts and raped her. She was then tied and gagged with her dress and hose and as he was leaving, defendant kicked her and said that he and his accomplice would never go to jail for what they had done. Complainant further testified that about one week later she and her husband were at a lounge with Hudson and Rockymore when she saw defendant and identified him as one of the men who attacked her.

Officer Dubois testified that when he arrived at the lounge he observed two men struggling with defendant and a security guard for the lounge told him that defendant was a rape suspect. Defendant attempted to escape but Dubois and his partner apprehended him, placed him under arrest, advised him of his constitutional rights and transported him to the police station where after being advised of his rights again, he was told that he had been implicated in a rape and when questioned concerning the identity of his accomplice, he named Tony Dixon as the other offender.

Defendant testified that the two men who took him out of the lounge told him they were looking for someone named "Greg." He denied knowing a "Greg" but when they punched him and said, "then you better start naming your friends," he gave them several names.

He denied raping the complainant or attempting to escape when the police arrived at the lounge. On cross-examination, he stated that while he was being held in the lot several people had gathered and were all talking at the same time. He denied telling the men who were holding him or the police that Tony Dixon was either his accomplice or "the other guy" and stated that he was with his girlfriend on the night of the rape.

It was stipulated that Assistant State's Attorney Gainer would testify that defendant admitted telling the men who held him for the police at the lounge that the "other guy" was Tony Dixon and that he referred to Dixon as his partner.

OPINION

Defendant first contends that he was denied due process of law by the trial court's failure to order a fitness hearing, arguing that there were sufficient facts presented to raise a *bona fide* doubt of his fitness to stand trial.

■ Initially, we note that defendant made no formal motion for a fitness hearing before or during trial nor did he raise this issue in his post-trial motion; nevertheless, because it would be a violation of due process to convict a defendant who was mentally unfit to stand trial (*People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261), we will consider the issue.

Under the Code of Criminal Procedure of 1963 (the Code), a defendant is unfit to stand trial if, because of his mental or physical condition, he is unable either (1) to understand the nature and purpose of the proceedings against him, or (2) to assist in his defense. (Ill. Rev. Stat. 1981, ch. 38, par. 104—10.) The Code further provides that "[w]hen a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further." (Ill. Rev. Stat. 1981, ch. 38, par. 104—11(a).) The determination of a defendant's fitness rests largely within the discretion of the trial court and a reviewing court will not overturn its decision absent a clear abuse of that discretion (*People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682; *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044).

In considering the question of defendant's fitness we initially note, from the transcript of proceedings, that in response to the court's inquiry, defendant indicated an awareness of the import and ramifications of his written jury waiver; and in a dialogue with the court concerning the numerous illness-related absences of his attorney, defendant expressed his preference for a substitution of counsel,

but explained that because he had exhausted his funds in retaining the attorney of record, he could not afford to retain new counsel and thereafter requested that one be appointed by the court. Furthermore, defendant testified on his own behalf at the pretrial suppression hearing and again at trial, giving appropriate, articulate and coherent responses to the examiners' questions on both occasions; and in a personal plea for leniency at the sentencing hearing, defendant expressed his desire to achieve various goals and to make worthy contributions to his family and to society. Moreover, notwithstanding his first attorney's pretrial requests for psychiatric evaluations, neither he nor the attorney representing defendant at trial ever asserted that defendant was unable to cooperate with them in his defense.

Apparently cognizant that his conduct as reflected in the transcript of proceedings was inconsistent with his assertion that a *bona fide* doubt as to his fitness existed, defendant emphasizes his psychiatric history and the trial court's authorization of two psychiatric examinations to demonstrate that such a doubt had been raised. In this regard, the record discloses that prior to trial it was brought to the court's attention that defendant had been discharged from the Air Force after being diagnosed as manic-depressive and that he was found incompetent in a prior criminal proceeding and committed to the department of mental health. Before commencing trial the court, on motions of defense counsel, ordered two psychiatric examinations which were performed nine months apart by different psychiatrists and, although defendant challenges the sufficiency of the reports thereon, each concluded that defendant was fit to stand trial.

■■■ It is well settled in Illinois that evidence of mental disturbances or even prior commitment for psychiatric treatment do not, in themselves, raise a *bona fide* doubt of defendant's current fitness (*People v. Green* (1983), 116 Ill. App. 3d 815, 452 N.E.2d 767; *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261) because fitness speaks only to defendant's ability to function within the context of trial and does not refer to sanity. A defendant can be fit for trial even though his mind may be otherwise unsound. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594, *appeal denied* (1979), 72 Ill. 2d 583.) Furthermore, the mere authorization of a psychiatric examination is not enough to establish that the trial court entertained a *bona fide* doubt of defendant's fitness. (*People v. Russo* (1972), 52 Ill. 2d 425, 288 N.E.2d 412; *People v. Olson* (1978), 60 Ill. App. 3d 535, 377 N.E.2d 371.) In view of defendant's apparent lucidity and coherence during the proceedings coupled with the pretrial findings of the examining

psychiatrists, we do not believe that his psychiatric history raised a *bona fide* doubt of his fitness to stand trial and we find that the trial court did not abuse its discretion in refusing to order a fitness hearing.

Defendant correlatively contends that the failure of the examining psychiatrists to comply with the requirements of section 104—15 of the Code (Ill. Rev. Stat. 1981, ch. 38, par. 104—15) in preparing their reports necessitates reversal and remandment for a new fitness examination. Relying on *People v. Harris* (1983), 113 Ill. App. 3d 663, 447 N.E.2d 941, he argues that the psychiatric reports received by the trial court were statutorily defective because they were merely conclusionary "form" reports lacking the requisite explanations as to how the diagnoses therein were reached or upon what facts they were based.

It is our view that *Harris* is factually distinguishable from the case at bar. There, the question of defendant's fitness was not raised before or during trial; however, at the sentencing hearing defense counsel advised the trial court that defendant could not be present because he had eaten some metal and glass and also informed the court, apparently for the first time, that defendant had attempted suicide both before and after trial. The presentence investigation report also revealed a history of mental problems and therapeutic treatment with an indication that after trial, defendant had been "put in restraints due to some form of acting out." On the motion of defense counsel, the trial court ordered a psychiatric examination, limiting it, however, to the question whether defendant was fit to participate in the sentencing process. The examination appears to have been hastily performed on the morning of the rescheduled sentencing hearing, and a report thereon—submitted to the court by 10 a.m. that same day—concluded that defendant was mentally fit for sentencing, stating only that he understood the nature of the charge pending against him, the purpose of the proceedings and was able to assist counsel therein.

Noting that nothing in the record disclosed the onset, diagnosis, prognosis or effect of defendant's mental condition or its possible relevance to his fitness to stand trial, the *Harris* court held that the facts presented raised a *bona fide* doubt of defendant's fitness to stand trial and that a hearing relative to that question should have been conducted; and while the court indicated that a retrospective competency review might otherwise be sufficient, it noted that the trial judge—whose recollection of defendant's demeanor at trial was vital to resolution of this issue—was deceased, and predicated its decision to reverse and remand on the basis of his absence. Only after de-

termining that a *bona fide* doubt of defendant's fitness had been raised did the *Harris* court address the sufficiency of the psychiatric report, finding that its "conclusory terms precluded the circuit court from independently evaluating its validity and hampered the court's ability to assess the need or lack thereof of a fitness hearing." The court reasoned that *"[u]nder the circumstances of this case,* the error was not harmless \*\*\*. As previously noted, defendant had a history of therapeutic treatment, and recently attempted to commit suicide. *These facts* underscore the importance of statutory compliance." (Emphasis added.) *People v. Harris* (1983), 113 Ill. App. 3d 663, 668-69, 447 N.E.2d 941, 945.

■■ While it is true that the challenged reports in the instant case, like those found to be insufficient in *Harris*, were conclusory, it is our view that the circumstances warranting reversal in *Harris* are absent here. First, unlike *Harris*, the question of defendant's fitness was raised prior to trial and the court was fully apprised of his psychiatric history. Second, there is nothing in the record before us to support defendant's assertion that the trial court relied solely on the two psychiatric examinations; indeed, as stated above, the court had ample opportunity to observe defendant and to independently evaluate his conduct both before and during this suppression hearing. In view thereof, we believe that the conclusory aspects of the reports were of minimal significance in the court's apparent finding that a fitness hearing was unnecessary. Finally, and most important, no facts were presented contradicting the conclusions therein. (See *People v. Green* (1983), 116 Ill. App. 3d 815, 452 N.E.2d 767.) Thus, while the reports may have been statutorily deficient, defendant has failed to demonstrate that he suffered any prejudice therefrom.

Defendant next contends that his inculpatory statement made while being detained by Deputy Sheriff Hudson should have been suppressed because it was unlawfully obtained during a custodial interrogation which was not preceded by the giving of *Miranda* warnings. Although defendant apparently conceded that there was probable cause for his arrest, he argues that because the deputy sheriff who arrested him did not advise him of his constitutional rights and because he named the "other guy" involved in the crimes only after repeated questioning by the complainant's husband who was acting as an instrumentality of the sheriff, the statement and its fruit—the subsequent statement to the police,—were improperly admitted.

■■ While it is true that the prosecution may not introduce statements stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the accused's

privilege against self-incrimination (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602; *People v. Nunn* (1981), 101 Ill. App. 3d 983, 428 N.E.2d 1158), the term "custodial interrogation" refers only to questioning initiated by law enforcement officers after the suspect was taken into custody or otherwise deprived of his freedom in any significant way (*Miranda v. Arizona* (1966), 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612). Confessions or admissions made in response to interrogation by private citizens are admissible even though the accused had not been advised of his *Miranda* rights before making them. *People v. Hawkins* (1972), 53 Ill. 2d 181, 290 N.E.2d 231.

■ At the hearing on the motion to suppress, defendant testified that Hudson, the complainant's husband and several other men repeatedly hit and questioned him in the vacant lot next to the lounge where he was apprehended, and defendant's sister and girlfriend also testified that all of the men present were asking defendant questions. However, Hudson testified that the only question he asked defendant was his name and that it was the complainant's husband who was questioning defendant while he (Hudson) stood between the two men. The complainant's husband acknowledged that he questioned defendant but stated that Hudson did not ask any questions. Rockymore also testified that the victim's husband who was "very excited" was the only one questioning defendant and that Hudson was "just trying to keep [him] cool."

At a hearing on a motion to suppress, it is the function of the trial court to weigh the credibility of the witnesses and to resolve conflicts in their testimony (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280), and its findings thereon will not be disturbed unless they are contrary to the manifest weight of the evidence (*People v. Hawkins* (1972), 53 Ill. 2d 181, 290 N.E.2d 231). At the close of hearing, the court concluded that the statements made by defendant were neither involuntarily made nor the product of a police-initiated or abetted interrogation and that the complainant's husband was not acting as an agent of the State in questioning defendant. Considering the evidence in its totality, we do not believe those findings were contrary to the manifest weight of this evidence.

Moreover, it is our view that *People v. Baugh* (1974), 19 Ill. App. 3d 448, 311 N.E.2d 607, *cert. denied* (1975), 421 U.S. 920, 43 L. Ed. 2d 789, 95 S. Ct. 1587, on which defendant relies, is distinguishable from the facts before us. There, after placing defendant under arrest, the police contacted the victim's attorney and informed him that an identification was necessary. Due to the victim's advanced age,

defendant was taken from the police station to her home where, in the presence of law enforcement authorities, her attorney conducted a lineup, interrogated defendant, confronted him with incriminating evidence and subsequently elicited his confession. The *Baugh* court held that the attorney was acting as a police instrumentality and that defendant's confession was the product of a police-initiated custodial interrogation and should have been suppressed. As we have stated, there is no evidence here that the deputy sheriff initiated or conducted the questioning resulting in defendant's statement or that he or the police otherwise used the complainant's husband as the conduit for the questioning. Rather, the testimony reveals that defendant's statement was made in response to the spontaneous accusations of a private citizen during an emotionally charged encounter. Given our finding that defendant's first statement was not the product of a "custodial interrogation" as defined by *Miranda*, it follows that admission of his other, near-identical, statement to police after being advised of his constitutional rights was not improper.

Defendant's final contention is that his sentences were excessive. Although he does not assert that the trial court erred in finding that these offenses were accompanied by exceptionally brutal and heinous behavior and thus qualified for the extended terms, he argues that the court improperly ignored his rehabilitative potential and that the terms are disproportionate to those imposed in similar cases.

■■ It is well settled that the trial court is the appropriate forum to determine a suitable sentence (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861), and so long as the sentences imposed are within the statutory limits, a reviewing court will not intervene absent a showing that the trial court otherwise abused its sentencing discretion (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213). Furthermore, while the penalty should be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship (Ill. Const. 1970, art. I, sec. 11), in balancing these factors, defendant's rehabilitative potential is entitled to no greater weight than the nature of the offense (*People v. Gallardo* (1983), 112 Ill. App. 3d 764, 445 N.E.2d 1213; *People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818), and a reasoned judgment as to the appropriate sentence must be based on the particular facts of each case (*People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182).

Before imposing sentence, the trial court here stated that it had considered all the factors brought to its attention at the hearing in aggravation and mitigation as well as the evidence adduced at trial,

the information contained in the presentence investigation report, the defendant's own plea for leniency and the possibility of his rehabilitation and noted both his age and lack of a criminal record. However, the court also described the case as "an example of a brutal and disgusting criminal act" and noted that complainant was attacked as she was entering her mother's home, threatened with a knife, robbed of her personal possessions, subjected to the physical and mental degradation of two acts of rape and at least two acts of deviate sexual assault and finally, was bound and gagged "like a bag of garbage" with her own clothing and struck by defendant, who told her that he and his accomplice would not go to jail for their acts.

These comments of the court are clearly supported by the record; indeed complainant's testimony additionally reveals that this brutal attack lasted at least two hours throughout which she was repeatedly struck about the head by defendant. Moreover, it is apparent that the trial court reached its decision only after a great deal of thought and deliberation, considering all the relevant factors in determining that an extended term of imprisonment was appropriate. Therefore, notwithstanding defendant's background, we cannot say that the sentences imposed, which were 20 years less than the maximum extended term for a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2(a)(2)) violated either the spirit or purpose of the law and find no abuse of discretion by the trial court in imposing them.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.