**UNITED STATES of America ex rel. Harold WILSON, Petitioner,**

v.

**Michael O'LEARY, Warden, Respondent.**

**No. 87 C 6521.**

United States District Court, N.D. Illinois, E.D.

March 17, 1988.

Frederick F. Cohn, Cohn & Associates, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. of Illinois, Criminal Appeals Div., Chicago, Ill., for respondent.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case involves a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner Harold Wilson ("Petitioner") seeks relief from his conviction for rape, deviate sexual assault, armed robbery and unlawful restraint on the grounds that respondent, the State of Illinois ("the State"), introduced at his trial inculpatory statements made by him following his arrest which were obtained from him in violation of his Fifth and Sixth Amendment rights. For the reasons set forth below, this court will order an evidentiary hearing on Petitioner's claims.

## FACTS

Although Petitioner urges this court to re-examine the factual findings of the State trial and appellate courts, such re-examination is unnecessary here.[1] The trial court found, and the appellate court affirmed, *People v. Wilson*, 124 Ill.App.3d 831, 80 Ill.Dec. 175, 464 N.E.2d 1158 (1984), that in the early hours of September 27, 1980, Allen Hudson, a deputy sheriff with the Cook County Sheriff's Department, took Petitioner into custody at the Toast of the Town Tavern in Chicago, Illinois. He did

---

1. Where the State courts did not make specific factual findings regarding certain issues, this court must seek to reconstruct those findings based on those courts' legal determinations. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In this case, the State courts' findings in favor of the State indicate that they believed the testimony of Hudson, so his testimony is incorporated in the statement of facts as if specifically made part of the State courts' factual findings.

so because Deborah Carter, who had accompanied him to the bar, identified Petitioner as the man who had raped her six days earlier, on September 20, 1980.

Hudson led Petitioner to a vacant lot next to the tavern. Several men and women accompanied the two men to the vacant lot, including Ms. Carter, her husband, her sister, and a number of her husband's male friends. At this point, Hudson asked Petitioner his name, while the other men began hurling questions and accusations at him.

As the confrontation escalated, Hudson decided to search Petitioner for weapons. He found a "small caliber handgun" in Petitioner's boot, retrieved it and handed it to one of the other men. He then left the scene.

During the course of the "emotionally charged encounter," Petitioner made inculpatory statements regarding the rape, the most significant being the name of an accomplice in the crime, Anthony Dixon. At no time during the encounter did Hudson (or anyone else) inform Petitioner of his constitutional rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Some time after the confrontation began, police officers from the Chicago Police Department arrived and placed Petitioner under arrest. They gave him the *Miranda* warnings and transported him to the police station. Petitioner repeated to these officers some of the statements he had made outside the tavern. At the police station, he confirmed to Assistant State's Attorney Gainer that he had told Hudson and the crowd outside the tavern about Anthony Dixon's involvement in the rape.

### STATE COURT PROCEEDINGS

Following a hearing on Petitioner's motion to suppress, the State trial court held that any inculpatory statements made by Petitioner on September 27, 1980 were admissible. The court reasoned that Hudson's failure to give Petitioner the *Miranda* warnings did not render the statements he made outside the tavern inadmissible, because the statements resulted from questioning by a private citizen, Ms. Car-

ter's irate husband, not State officials. The court further found that Petitioner's statements outside the tavern were not the product of "coercion, physical coercion, involuntariness."

At Petitioner's trial, the State did not introduce the statements Petitioner made to Hudson and the crowd outside the tavern. It did, however, provide testimony as to the "near-identical" inculpatory statement Petitioner made to police after they had arrived at the scene, arrested him, advised him of his rights and transported him back to the police station:

[State]: After he responded, yes, to the final question, do you wish to answer questions at this time, did you have a conversation with the defendant.

[Officer Dubois]: Yes, I did.

[State]: How long did this conversation last?

[Officer Dubois]: Approximately five minutes.

[State]: During this conversation, did the defendant make any statements to you regarding the rape of Deborah Carter on September 20, 1980?

[Officer Dubois]: When I asked him about it, he remained silent.

[State]: Did you ask him any other questions regarding the rape?

[Defense]: Objection.

[Court]: Overruled. You may answer.

[Officer Dubois]: Yes. I informed him that he was implicated in the rape. I was interested in knowing the party that was involved with him.

[State]: Did he respond to you?

[Officer Dubois]: Yes. He said Tony was involved.

[State]: Did he—did you say anything when he said, Tony?

[Officer Dubois]: Yes. I asked what Tony's full name was.

[State]: Did he say anything to you?

[Officer Dubois]: Yes, that his name was Anthony Dixon.

The State also introduced a stipulation that, if called to testify, Assistant State's Attorney Gainer would state that Petitioner had told him that he, Petitioner, had in

fact stated to the crowd outside the tavern that Anthony Dixon had joined him in the commission of the crime.

The State appellate court affirmed the trial court's admission of the inculpatory statements. After noting that Petitioner was "in custody" from the time that Hudson first confronted him inside the tavern, it then upheld the trial court's determination that the questioning of Petitioner outside the tavern did not constitute·an official interrogation and did not compel an involuntary confession from Petitioner. The court further reasoned that, "[g]iven our finding that defendant's first statement was not the product of a custodial interrogation as defined by *Miranda*, it follows that admission of his other, near-identical, statement to police after being advised of his constitutional rights was not improper." *People v. Wilson*, 124 Ill.App.3d at 841, 80 Ill.Dec. 175, 464 N.E.2d 1158.

## DISCUSSION

### Statements Outside the Tavern

▇ This court must give a presumption of correctness to the State courts' findings of historical fact. *United States ex rel. Church v. DeRobertis*, 771 F.2d 1015 (7th Cir.1985). This presumption does not apply, however, to mixed questions of law and fact. *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982).

In this case, the presumption of correctness applies to the finding that Petitioner was in custody at the time he made the inculpatory statements, that he made them as a result of the questions and accusations posed by Ms. Carter's husband and friends, and that he repeated them to the police and assistant state's attorney after he had been provided with the *Miranda* warnings. The presumption also applies to the trial court's determination that the inculpatory statements were not obtained through "physical coercion." [2]

The presumption of correctness does not apply, however, to the State court's conclusion that Hudson's conduct after taking Petitioner into custody did not amount to an official interrogation requiring recitation of the *Miranda* warnings. The determination of what constitutes an official interrogation is clearly a mixed question of law and fact, *see Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), requiring *de novo* review by the federal habeas court. *Cf. Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (voluntariness of confession is "a legal inquiry requiring plenary federal review").

▇ Since the presumption of correctness does not apply to this issue, this court could, in making its *de novo* determination, go beyond the findings of the State court, either to the record or, if necessary to an evidentiary hearing in this court. 3 Lefave and Israel, *Criminal Procedure*, § 27.6(d) at 370–75. In this case, however, no such inquiry is necessary. For this court has concluded, on the basis alone of the factual findings provided by the State courts, that Hudson's conduct amounted to an official custodial interrogation to which *Miranda* applies.

In ruling that Petitioner's statements outside the tavern were admissible, the State appellate court noted that *Miranda* applies only to "questioning initiated by law enforcement officers after a person

**2.** Although *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), held that the voluntariness of a confession is "a legal inquiry requiring plenary federal review," factual issues underlying the voluntariness determination remain entitled to the presumption of correctness. *See* 3 Lefave and Israel, *Criminal Procedure*, § 27.6(d) at 62–63 (1987 Supp.). Thus, whereas the presumption does not apply to the State courts' determination that Petitioner's statements outside the tavern were made voluntarily, it does apply to the finding that *physical* force was not involved.

In addition, it should be noted that, insofar as Petitioner argues here that the nature of the interrogation outside the tavern renders Petitioner's statements·inadmissible irrespective of whether this court finds the interrogation to have been conducted by a law enforcement officer, the Supreme Court has rejected this argument. *See Colorado v. Connelly*, — U.S. —, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.").

has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444, 86 S.Ct. at 1612. It then reasoned that, since the trial court had found that Ms. Carter's husband did all of the questioning, the interrogation of Petitioner was not "initiated by law enforcement officers," and that, accordingly, the failure to provide Petitioner with the *Miranda* warnings did not render the statements inadmissible.

The flaw in this analysis lies in the misapprehension as to what constitutes an "interrogation." Although the Supreme Court has never addressed this question in the precise factual scenario involved here, it has made quite clear in other contexts that "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning *or its functional equivalent.*" *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (emphasis added). Since Hudson did not himself expressly question Petitioner, the question becomes whether his conduct amounted to the "functional equivalent" of questioning.

The Supreme Court has provided rather specific guidelines for making this determination:

> [T]he term 'interrogation' in *Miranda* refers ... in any words or actions on the part of the police (other than those normally attendant to arrest) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response froma suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the defintion of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. at 301–02, 100 S.Ct. at 1689–90 (emphasis in original). *See also United States ex rel. Church v. DeRobertis*, 771 F.2d 1015 (7th Cir.1985).[3]

In this case, there is no question that Hudson should reasonably have known that his conduct after taking Petitioner into custody was "likely to evoke an incriminating response from Petitioner." Hudson led Petitioner from a crowded bar to a vacant alley, accompanied by a number of men plainly hostile to Petitioner. Hudson asked Petitioner his name, and then, with Petitioner backed against a car, permitted others to hurl questions and accusations at Petitioner while he, Hudson, stood by and watched. He gave a gun to one of the hostile individuals at the scene. He did not call for the police.

The only conclusion that can be drawn from these facts is that Hudson's conduct amounted to an official custodial interrogation, and that, since no *Miranda* warnings were given, the inculpatory statements Petitioner made during this encounter were inadmissible against him.

*Statements to Police Following Arrest*

■ The conclusion that Hudson's failure to provide Petitioner with the Miranda warnings renders the statements made outside the tavern inadmissible does not, of course, end the inquiry here. The State did

---

3. The Seventh Circuit's opinion in *Church* provides considerable guidance in the instant case. In *Church,* the petitioner contended that placing his brother in a cell with him after he had been taken into custody amounted to an official interrogation. The Seventh Circuit rejected this claim on the grounds that the action did not constitute an "interrogation" for *Miranda* pur-

poses. The Court's opinion clearly indicates, however, that if the action had amounted to an "interrogation," the fact that the confession resulted from a conversation with a private citizen, rather than the police, would not have prevented *Miranda* from barring its admissibility.

not introduce these statements into evidence at trial. Instead, it introduced the "near-identical" statements Petitioner made to the police and the Assistant State's Attorney after Petitioner was arrested and the *Miranda* warnings given. Thus, this court must determine whether the events resulting in the inadmissible inculpatory statements outside the tavern render Petitioner's later statements at the police station inadmissible as well.[4]

In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court held that the mere technical violation of the *Miranda* prophylactic rules does not require that later statements made by the defendant be examined under the "fruit of the poisonous tree" doctrine. Rather, when State officials obtain inculpatory statements from a suspect through violations of the *Miranda* rules, the "relevant inquiry" for determining whether a later statement, made after *Miranda* warnings have been properly provided, is also inadmissible "is whether, in fact, the second statement was ... made voluntarily." *Id.* 470 U.S. at 319, 105 S.Ct. at 1298.

The *Oregon v. Elstad* holding was limited to cases in which the first statement was obtained through "unwarned though uncoercive questioning." *Id.* at 318, 105 S.Ct. at 1298. In this case, it is clear that the deputy sheriff's conduct outside the tavern involved a good deal of coercion.[5] Thus, it could be argued, *Oregon v. Elstad* is inapposite, and this court should undertake traditional "fruit of the poisonous tree" analysis in determining the admissibility of the later statements.

Yet, careful analysis of the *Elstad* decision indicates that the proper inquiry for *any* statements obtained following a proper application of the *Miranda* warnings should be whether they were "voluntary." Although this inquiry, will of course, take into consideration the degree of coercion, if any, resulting in the first statements, the presence of early coercion should not preclude a determination that later, post-*Miranda* statements, were voluntary and hence admissible.

Turning to the facts of the instant case, then, it becomes necessary to determine

**4.** The State contends that Petitioner's argument for the inadmissibility of this statement is foreclosed because, on direct appeal to the State appellate court, Petitioner sought suppression of this statement as "the fruit of the statement" made outside the tavern, whereas the Petitioner argues here that the statement resulted from a new violation of his Fifth Amendment rights. This court rejects the State's position for two reasons.

First, the State appellate court's decision suggests that it did examine the constitutional validity of the later statement, and upheld it only because the court found that there was no coercion leading to the earlier statement which might have infected the later one. Accordingly, the procedural default doctrine does not apply. *See* 3 Lefave and Israel, *Criminal Procedure,* § 27.4(a) at 329 n. 2 ("If the state courts are willing to consider a constitutional claim notwithstanding the defendant's failure to present it in accordance with applicable state procedural requirements, the the federal habeas court can also consider the claim if it is otherwise cognizable.").

Second, even if the State court's decision does not reflect a resolution of this claim, the procedural default doctrine would not bar this court's habeas review. Petitioner's failure to assert an independent constitutional violation by the police at the police station undoubtedly arose from his inability to foresee the Supreme

Court's rejection, in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), of the "fruit of the poisonous tree doctrine" in the Fifth Amendment context. *Elstad,* if not an actual break from prior law, represented a sufficiently novel approach to "cat out of the bag" situations, *see Oregon v. Elstad,* 470 U.S. at 321, 105 S.Ct. at 1299 (Brennan, J., dissenting) (noting that "the Court rejects the 'cat out of the bag' presumption *entirely* and instead adopts a new rule ...") (emphasis in original), to satisfy the "cause" prong of the "cause and prejudice" test. *See Reed v. Ross,* 468 U.S. 1, 13, 104 S.Ct. 2901, 2908–09, 82 L.Ed.2d 1 (1984). Since defendant clearly suffered "actual prejudice" through the introduction at trial of the inculpatory statement he made to the police—the statement purportedly represents an admission by Petitioner that he had an accomplice in the crime—the "prejudice" prong of the test is satisfied as well.

**5.** Although the state courts held that Petitioner's statements outside the tavern were not the product of "physical coercion" so as to render them involuntary as a matter of law, these courts did not say that they had found no coercive activity aimed at Petitioner. On the contrary, in distinguishing the actions of Hudson from those of the other men outside the tavern, the state courts acknowledged the coercive nature of some of the actions taken by the private citizens.

whether, in light of all that had occurred outside the tavern, Petitioner's inculpatory statements to the police and the State's Attorney at the police station were "voluntary." The problem here, however, is that the answer to this question cannot be determined from the record; for the State court disallowed any inquiry into the circumstances surrounding those statements, apparently assuming that, if the initial statements were inadmissible, the later statements would be as well. Furthermore, neither the trial court nor the State appellate court made a finding regarding the voluntariness of the later statements—which finding would not, in any case bind this court, *Miller v. Fenton,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985)—because both reasoned that their determinations that the first statements were admissible made any inquiry into the admissibility of the second statements unnecessary.

Accordingly, this court concludes that an evidentiary hearing is necessary to determine whether, in light of the events preceding Petitioner's inculpatory statements to the police—most significantly, the coercive scene outside the tavern and the giving of the *Miranda* warnings at the police station—the inculpatory statements used against Petitioner at trial were voluntary. Petitioner will bear the burden of persuading this court by a preponderance of the evidence that the statements were not, in fact, voluntarily made.

## CONCLUSION

A ruling on Petitioner's petition for habeas relief is withheld pending an evidentiary hearing as to the voluntariness of the inculpatory statements made by Petitioner and used against him at trial.