THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALFONSO BENNETT, Defendant-Appellant.

First District (2nd Division)   No. 85—3133

Opinion filed August 4, 1987.

Steven Clark and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., James E. Fitzgerald, and Terry Takash, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendant-appellant Alfonso Bennett (Bennett) was arrested on November 17, 1983, and charged with murder in connection with the November 25, 1980, shooting death of Lenora Mitchell (Lenora). At the time of the shooting, Bennett and Lenora were dating, although previously they had lived together. Pursuant to a court order, Bennett was examined by two psychiatrists prior to trial, both of whom concluded that he was fit to stand trial. A jury subsequently found Bennett guilty of the charged offense, and the court sentenced him to a 40-year term of imprisonment.

On appeal, Bennett contends that: (1) he was not proved guilty beyond a reasonable doubt; (2) he was denied a fair trial because the

State allegedly emphasized inadmissible hearsay evidence; (3) he was denied a fair trial for the additional reason that the State in closing argument allegedly encouraged the jury to fabricate a motive; (4) he was denied his due process right not to be tried while mentally incompetent; and (5) the imposition of a 40-year term of imprisonment constituted an abuse of discretion. We affirm.

The record discloses that Samuel Crossley, an usher at Monumental Faith Evangelical Church located at 73rd Street and Chappel Avenue in Chicago, testified that he saw Bennett and Lenora together at evening services on the day of the shooting. Crossley recalled that they disrupted the service by repeatedly exiting and entering the church. He went to the couple's pew to see what the problem was and learned that Bennett wanted to leave, whereupon Bennett proceeded to go to his car without Lenora. Crossley agreed to escort Lenora to the car in order for her to retrieve her purse, but when Lenora attempted to open the car door, Bennett "took off" without permitting Lenora to reclaim the purse.

After the service, Crossley and his wife drove Lenora to her home at 102nd and State Streets. He testified that as Lenora walked up to her house he heard two gunshots, saw two bright flashes, and observed Lenora fall backwards. Crossley could not see who fired the shots. He immediately left the scene and "flagged down" a police car.

However, nothing could be done to save Lenora. Dr. Tae An, a pathologist with the Cook County medical examiner's office, testified that he performed an autopsy on Lenora the day after the shooting and determined that she died as a result of bullet wounds to the head and chest which lacerated her brain, liver, and aorta. In examining the body, Dr. An retrieved a bullet that had lodged inside Lenora's skull and forwarded it to the Chicago police department crime laboratory.

Chicago police detective David Dioguardi testified that he was assigned to investigate Lenora's death. He stated that he tried to discover Bennett's whereabouts immediately after the incident, but was unable to do so until Bennett voluntarily appeared at the police station the day after the shooting, inexplicably bringing with him Lenora's purse, and asked the police why they wanted to talk to him. After the detective explained the reason for seeking him, Bennett told Dioguardi that on the day of the shooting he picked Lenora up at work, that they attended church, but that he wanted to leave the service because he did not like the sermon. Bennett admitted to Dioguardi that he argued with Lenora at the church concerning the

quality of the sermon and that he wanted to leave. The witness recalled that Bennett claimed that after leaving the church he went to the Godfather cocktail lounge at 77th and Halsted Streets before returning home at 2 or 2:30 a.m.

After this initial conversation, Bennett was detained by the police until Dioguardi and his partner again interrogated him several hours later regarding certain inconsistencies in his earlier statements. In response to these questions, Bennett told them that his twin brother "Ronnie," whom he characterized as a "violent and evil person," was probably responsible for Lenora's death. Dioguardi further related that Bennett stated that Ronnie probably hid the murder weapon under his bed at home. Shortly after receiving this information, Dioguardi executed a valid search warrant of what he believed, based on his supplemental police reports, to be Bennett's residence located at 49 E. 103rd Place.

Though the search did not uncover any weapons, Dioguardi recalled that a woman who identified herself as Bennett's mother was at the house during the search and that he talked to her about whether Bennett had a twin brother named Ronnie. The court sustained the defense's objection to the State's inquiry into what Bennett's mother may have told Dioguardi about the twin brother. He was permitted to testify, however, to a subsequent conversation he had with Bennett, in which he informed him that he had learned that Bennett did not have a twin brother, but that on occasion Bennett would refer to himself as Ronnie or assert that Ronnie had done something for which Bennett was blamed. Dioguardi emphasized, in his testimony, that Bennett's middle name was Ronnie. The detective related that upon being confronted with this evidence, Bennett admitted that he did not have a twin brother and that he himself was Ronnie. Bennett was not arrested at this time; instead, he was released from detention.

Officer Dennis Cullom testified that approximately 10 months later, on September 18, 1981, he and his partner searched, pursuant to a valid warrant, the same house Dioguardi had previously searched at 49 E. 103rd Place. He stated that while he and his partner were in the house, they met a young woman who identified herself as Debra Bennett. On cross-examination Cullom testified that he had also seen Bennett on the porch of the home on a number of occasions between 1975 and 1978.

Cullom recalled that, as a result of the search, he recovered a .38 caliber revolver and a "sawed-off" shotgun from the attic of the 49 E. 103rd Place residence. The officers forwarded both weapons to

the Chicago police department crime laboratory, where they were examined by specialists. There were no fingerprints found on the weapons. However, Vincent Lomoro, a Chicago police officer assigned to the crime lab, testified that he compared a bullet fired from the .38 caliber revolver found at 49 E. 103rd Place and the bullet surgically removed from Lenora's skull. It was his opinion that the bullet taken from the victim's head was fired from the .38 caliber revolver which had been found at 49 E. 103rd Place. Over the defense's objection, based on the failure of the State to connect the weapon to Bennett, the gun was admitted into evidence.

The only defense witness was Detective Joseph Bonodonna, a Chicago police officer employed in the gun registration department, who testified that the gun which was admitted into evidence was registered to the "Interstate Services Corporation." He related that the corporation had informed his office that the weapon was stolen on January 11, 1978, but that it was subsequently recovered on January 14, 1978, and that he had received no other report from the corporation concerning the whereabouts of the gun.

■ The defendant first contends that the evidence presented against him was insufficient to prove him guilty beyond a reasonable doubt. In support of this contention, Bennett argues that: (1) the evidence linking him to the alleged murder weapon was tenuous, because the State first failed to prove that Bennett lived at or had access to the 49 E. 103rd Place residence where the gun was found, and secondly it did not, with any certainty, connect the weapon to the shooting; (2) Bennett's alleged statements to Dioguardi should not have been given substantial weight since they were not a confession, but rather they were merely admissions which damage only his credibility; and (3) Crossley's testimony indicated that the argument in church was only a minor disagreement concerning the quality of the sermon, and did not give Bennett a motive to murder Lenora.

Initially, we note that a jury verdict will not be reversed unless the evidence, viewed in a light most favorable to the prosecution, is so unsatisfactory, improbable, or inconclusive that no rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 147, 475 N.E.2d 606; *People v. Hunter* (1984), 124 Ill. App. 3d 516, 525, 464 N.E.2d 659.) With this standard in mind, we first consider Bennett's contention that the State failed to link him to the .38 caliber revolver found at 49 E. 103rd Place.

■ The State relied on the testimony of Officers Dioguardi and Cullom to connect Bennett to the house where the gun was found:

Dioguardi testified that he executed a search warrant at the 49 E. 103rd Place residence shortly after his initial interview with Bennett, and while conducting the search, he talked with Bennett's mother there. Dioguardi claimed that he knew this to be Bennett's home because this was the address he had written in his supplemental police reports. Furthermore, Cullom testified that when he later searched the house in September 1981, he met a woman who identified herself as Debra Bennett. Cullom also asserted that he saw the defendant on the front porch of the house on numerous occasions between 1975 and 1978. Though there was only circumstantial evidence offered by the State to show that Bennett lived at 49 E. 103rd Place, in light of the above testimony we believe that the jury reasonably concluded that the residence was a place which Bennett at least frequented. Certainly the jury's belief that Bennett either lived at or had access to the dwelling at 49 E. 103rd Place was not so unsatisfactory, improbable, or inconclusive as to bring into question the reasonableness of the verdict.

Let us turn now to whether the State proved that the .38 caliber revolver recovered from the 49 E. 103rd Place residence was the murder weapon. As noted earlier, the only witness for the defense was Officer Bonodonna, who testified that the gun was registered to the Interstate Services Corporation. Bennett maintains that the evidence that almost three years prior to the shooting, the corporation reported the gun missing, that it was subsequently recovered three days later, and that the owner never reported it missing again belies any link between the gun and the offense. Bonodonna's testimony, however, must be weighed against that of Officer Lomoro, a ballistics expert, whose opinion it was that the gun found at 49 E. 103rd Place was the same weapon used to kill Lenora. We believe it was manifestly reasonable for the jury to conclude that somehow Bennett had obtained the weapon and used it to deadly effect, despite the fact that the corporation had not again reported the gun missing or stolen.

Therefore, we believe that the State proved beyond a reasonable doubt that Bennett had access to the house in which the gun was recovered, and also that the gun recovered therein was the murder weapon. Bennett's guilt beyond a reasonable doubt is especially manifest when, in addition to the evidence of Bennett's association with the murder weapon, we consider the testimony of Dioguardi, who, as noted earlier, related that Bennett first told him that his evil twin brother Ronnie probably committed the offense and later admitted that he did not have a twin and that he was Ronnie.

■■ ■ Bennett contends that his "out-of-court remarks [to Dioguardi] did not prove him guilty beyond a reasonable doubt because they were at most an inculpatory admission, rather than a more probative confession." However, this court has held that "[a]n admission is any statement *** by a defendant which, when considered with other facts and evidence, permits an inference of guilt of the offense charged" (*People v. Burns* (1981), 99 Ill. App. 3d 42, 45, 424 N.E.2d 1298), and, moreover, that "[w]here an admission is proffered against a defendant, it is always admissible as substantive evidence for the purpose of showing guilt" (99 Ill. App. 3d 42, 45, 424 N.E.2d 1298). Therefore, even if regarded merely as admissions, Bennett's statements unquestionably illustrate that he was conscious of his guilt. We hold that the jury was entirely justified in inferring guilt from Bennett's statements.

The jury's verdict is also buttressed by the testimony of Crossley, the church usher, who witnessed Bennett's and Lenora's dispute during church services. Bennett argues that the triviality of this disagreement hardly makes it more likely that he shot Lenora. However, Crossley's uncontradicted observations show that Bennett was angry enough to leave Lenora at the church without a means of returning home, and that almost immediately thereafter she was gunned down. This testimony, when considered with the evidence linking Bennett with the murder weapon as well as Bennett's statements to Dioguardi, renders it clear that Bennett was most assuredly proved guilty beyond a reasonable doubt.

■■ Bennett next contends that the State relied on inadmissible hearsay statements allegedly made by Bennett's mother to Officer Dioguardi. In support of this argument, he highlights the following exchange which occurred during direct examination, when Dioguardi was testifying to his recollection of what transpired when he confronted Bennett with the information he had obtained from Bennett's mother, namely that Bennett did not have a twin brother:

"DIOGUARDI: When I talked to [Bennett], at this time I informed him that I—that I had determined that he did not have a brother by the name of Ronnie. In fact, that I was informed that—

DEFENSE COUNSEL: Objection.

THE COURT: Overruled. That is what the officer is relating to the defendant.

DEFENSE COUNSEL: Fine, judge.

DIOGUARDI: I had further learned that he uses the name, Ronnie. That is, in fact, his middle name and that his mother

sometimes refers to him as Ronnie, and that he sometimes referred to himself as Ronnie or would refer to Ronnie as having done something that he would be accused.

PROSECUTION: Did he tell you in that, in fact, he did not have a twin brother?

DIOGUARDI: He did admit that he did not have a twin brother by the name of Ronnie, that, in fact, he was Ronnie."

Further, during closing argument, the prosecutor also made the following remarks:

"PROSECUTION: [Dioguardi] checked it out. He investigated. He went to the defendant's house. He talked with his mother, the defendant's mother. After he received that information from defendant's mother, he told the defendant, hey, you don't have any twin brother, Ronnie.

DEFENSE COUNSEL: Objection, Judge. Objection to anything he told the defendant.

THE COURT: Overruled."

According to Bennett, these improper uses of the mother's statement were "unfair and prejudicial," and therefore require reversal of the conviction.

■ The State, however, persuasively points out that Dioguardi's testimony did not refer to any statements made by Bennett's mother, but instead merely related what he said to Bennett and how Bennett responded to those remarks; hence, there is no discernible hearsay problem with Dioguardi's testimony. In contrast, the prosecutor in his summation did indeed briefly discuss hearsay statements by Bennett's mother. However, the defense objected specifically to what Dioguardi told Bennett, not to what Bennett's mother told the officer. The law is clear that "[a]n objection to evidence based upon a specific ground is a waiver of objection on all grounds not specified." (*People v. Washington* (1962), 23 Ill. 2d 546, 548, 179 N.E.2d 635.) Accordingly, we hold that Bennett waived any objection to the alleged improper use of hearsay during the State's closing argument. In any event, in order to merit reversal, such prosecutorial misconduct must be shown to have been of such a nature that the verdict would have been different had the prosecutor refrained from making the comments. (*People v. Richard* (1980), 90 Ill. App. 3d 322, 334-35, 413 N.E.2d 5.) Considering the evidence in its entirety, even if the State did mention inadmissible hearsay statements, in this instance any such error was clearly harmless.

■ Bennett next asserts that he was denied a fair trial when during closing argument the prosecutor allegedly encouraged the jury

to fabricate a motive. During the State's summation, the following exchange occurred as the prosecutor was discussing what had transpired at the church on the day of the shooting:

"PROSECUTION: All three ushers walk out [to the front of the church] with her, and they watch as this woman tries to retrieve her purse, maybe tries to get that last vestige from him that would connect him. Maybe, this was the last straw. I don't want to see you no more, give me my purse, no way. He takes off.

DEFENSE COUNSEL: Objection, judge. There's no evidence of that.

THE COURT: Sustained. There's no evidence of that conversation, ladies and gentlemen. You will disregard that portion of the argument.

PROSECUTION: Reasonable inferences, ladies and gentlemen. You can make reasonable inferences.

DEFENSE COUNSEL: Objection, judge.

THE COURT: Overruled."

Bennett claims that the State violated the well-established principle that a prosecutor may not comment on facts not in evidence. (*People v. Connors* (1980), 82 Ill. App. 3d 312, 320, 402 N.E.2d 773.) Furthermore, Bennett's argument continues, the prosecutor vitiated any effect the court's ruling may have had by inviting the jury to draw inferences which were unsupported by the evidence. Bennett concludes that granting to the jury the discretion to draw such inferences was highly improper and only encouraged the jury to fabricate a motive unsupported by the testimony.

However, it is well settled that a prosecutor is well within bounds when in closing argument he or she urges the jury to make reasonable inferences from the facts in evidence. This court has stated that:

"[t]here is no error when the prosecution comments about a subject, 'If that subject is proved either by direct evidence or is fairly inferable from facts and circumstances proved. An argument based upon the facts appearing in the proof or on legitimate inferences deducible therefrom is proper.' " (*People v. Johnson* (1984), 122 Ill. App. 3d 532, 538-39, 461 N.E.2d 585; citing *People v. Jackson* (1981), 100 Ill. App. 3d 318, 320, 426 N.E.2d 1132; *People v. Garza* (1981), 92 Ill. App. 3d 723, 415 N.E.2d 1328.)

Crossley's unrebutted testimony clearly established that Bennett and Lenora had a disagreement in church. Thus, when the prosecutor

speculated as to a conversation which may have occurred with regard to that argument, we believe such conjecture was permissibly based upon the evidence presented at trial or at least on legitimate inferences deducible therefrom. Even if the prosecutor were inviting the jury to engage in impermissible speculation, we cannot say that the remarks were "so prejudicial that they constituted a material fact in [Bennett's] conviction or resulted in substantial prejudice." (*People v. Johnson* (1984), 122 Ill. App. 3d 532, 539, 461 N.E.2d 585.) Hence, we hold that no reversible error was committed by the trial court in this respect.

We focus now on Bennett's contention that the trial court violated his due process right not to be tried while mentally incompetent when the judge ordered psychiatric examinations to determine if Bennett was fit to stand trial, but proceeded nevertheless to trial without receiving a statutorily sufficient psychiatric report. The General Assembly has established that psychiatric reports made for the purpose of determining fitness for trial must contain:

"(1) A diagnosis and an explanation as to how it was reached and the facts upon which it is based;

(2) A description of the defendant's mental or physical disability, if any; its severity; and an opinion as to whether and to what extent it impairs the defendant's ability to understand the nature and purpose of the proceedings against him or to assist in his defense, or both." (Ill. Rev. Stat. 1985, ch. 38, par. 104—15(a).)

The first of two psychiatric reports upon which the trial court relied herein in determining that Bennett was fit for trial contained the following:

"Pursuant to the Honorable Judge Karnesis' [*sic*] Order the undersigned psychiatrist examined the above defendant on November 30, 1983.

Based on the above examination, it is my opinion that this defendant has a personality disorder characterized by odd and eccentric thinking but he is still in contact with reality and shows ability to understand the charges and proceedings against him and is able to cooperate with counsel. He is fit for trial."

The second read as follows:

"Pursuant to Your Honor's Order, the undersigned psychiatrist examined the above defendant on March 4, 1985.

This defendant is in contact with reality and is able to understand the charges and proceedings against him. He is able

to cooperate with counsel in his own defense and is fit for trial."

Bennett proposes that although both reports concluded that he was fit for trial, neither contained the detail required by statute; consequently, the judge was unable to make an informed decision as to whether there was a *bona fide* doubt of Bennett's fitness for trial.

Bennett places great reliance on the case of *People v. Harris* (1983), 113 Ill. App. 3d 663, 447 N.E.2d 941, wherein this court held that the conclusory terms of a psychiatric report virtually identical to the reports at issue herein "precluded the circuit court from independently evaluating its validity and hampered the court's ability to assess the need or lack thereof of a fitness hearing." (113 Ill. App. 3d 663, 668, 447 N.E.2d 941.) In *Harris*, we found that the deficient reports could not be considered harmless error since a *bona fide* doubt as to defendant's fitness for trial did indeed exist; but the court noted certain psychiatric conditions which were not brought to the attention of the trial judge, namely that "defendant had a history of therapeutic treatment, and recently attempted to commit suicide," and we commented that "[t]hese facts underscore the importance of statutory compliance." 113 Ill. App. 3d 663, 669, 447 N.E.2d 941.

Under different circumstances noted below, however, this court has held that the technical failure to comply with the statutory requirements of section 104—15(a) can be harmless error. For example, in *People v. Laboy-Rivera* (1984), 126 Ill. App. 3d 197, 466 N.E.2d 1144, the court noted that defense counsel never presented the trial judge with proof which would indicate that the defendant was not fit to stand trial and that the record was also devoid of facts which raised a *bona fide* doubt as to defendant's competency. Instead, this court found that defendant's answers were "lucid and articulate and demonstrated that defendant had an understanding of the nature of the proceedings." (126 Ill. App. 3d 197, 204, 466 N.E.2d 1144.) Therefore, "[u]nder these circumstances, any error which occurred as a result of the trial court's failure to insure that the psychiatric report complied with the requirements of section 104—15(a) was harmless." 126 Ill. App. 3d 197, 204, 466 N.E.2d 1144.

Similarly, in *People v. Wilson* (1984), 124 Ill. App. 3d 831, 464 N.E.2d 1158, this court held that the circumstances which warranted reversal in *Harris* were absent:

"First, unlike *Harris*, the question of defendant's fitness was raised prior to trial and the court was fully apprised of his psychiatric history. Second, there is nothing in the record before us to support defendant's assertion that the trial court re-

lied solely on the two psychiatric examinations; indeed, as stated above, the court had ample opportunity to observe defendant and to independently evaluate his conduct both before and during the suppression hearing. In view thereof, we believe that the conclusory aspects of the reports were of minimal significance in the court's apparent finding that a fitness hearing was unnecessary. Finally, and most important, no facts were presented contradicting the conclusions therein." (124 Ill. App. 3d 831, 839, 464 N.E.2d 1158.)

The court in *Wilson* concluded that "while the reports may have been statutorily deficient, defendant has failed to demonstrate that he suffered any prejudice therefrom." 124 Ill. App. 3d 831, 839, 464 N.E.2d 1158.

■ It is apparent to us that the two psychiatric reports relied upon by the trial judge herein are statutorily deficient. Obviously, they do not explain how the diagnoses were obtained, nor do they delineate the facts upon which the conclusions were based. For these reasons, the reports arguably restricted the court's ability to assess independently the need for a fitness hearing. However, as in *Wilson* and *Laboy-Rivera*, we believe that the statutory deficiencies of the two reports constitute harmless, technical error. The question of Bennett's fitness was raised prior to trial, and the court was fully apprised of Bennett's psychiatric history. Moreover, the trial court observed and talked to Bennett at the preliminary proceedings, and thus had ample opportunity to make an independent determination that Bennett understood the nature and purpose of the proceedings and would be able to assist in his own defense. Furthermore, the defense did not present the court with facts indicating unfitness.

■ Bennett's final argument is that the trial court's imposition of the maximum sentence under the statute for murder constituted an abuse of discretion. It is well settled that a trial court's decision regarding the sentence imposed will not be altered absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) The General Assembly has mandated that a sentence of not less than 20 years and not more than 40 years may be imposed for a murder conviction. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(a).) Clearly, the sentence meted out herein was within the statutory guidelines. However, pursuant to Supreme Court Rule 615 (b)(4) (87 Ill. 2d R. 615(b)), this court has the discretionary power to reduce a sentence which it considers to be excessive, even if it is within the statutory limits, "if that sentence is greatly at variance with the purpose and spirit of the law." *People v. Steffens*

(1985), 131 Ill. App. 3d 141, 151, 475 N.E.2d 606; *People v. Gibbs* (1977), 49 Ill. App. 3d 644, 648, 364 N.E.2d 491.

■■ Bennett argues that the sentence imposed upon him was greatly at variance with the purpose and spirit of the law because the judge, he maintains, improperly weighed as an aggravating factor the fact that the murder resulted in the death of a person, an obvious element of the offense. The trial court did indeed state in sentencing that the defendant "has murdered a person." However, this mere declaration on the part of the trial judge does not prove that he considered this as an aggravating factor. For example, in *People v. Middleswart* (1984), 124 Ill. App. 3d 35, 463 N.E.2d 1050, the trial court stated in the sentencing hearing that it could not " 'overlook the fact that [the defendant's] conduct and behavior resulted in the infliction of death to another person.' " (124 Ill. App. 3d 35, 41, 463 N.E.2d 1050.) This court rejected the defendant's argument that his sentence should be reduced based on his charge that the judge relied on an element of the offense as an aggravating factor, holding, instead, that the death of the victim was noted only briefly, and the sentence was justified on other grounds.

The circumstances herein are similar. The trial judge in the case at bar noted the death of Lenora only perfunctorily and based the sentence on other considerations, namely, Bennett's prior criminal record consisting of three felony convictions, his rehabilitative possibilities, and the fact that the murder was an ambush slaying. These other grounds expressed by the trial court doubtless justify the sentence. Therefore, in light of the wide discretion afforded the sentencing judge, the 40-year sentence is affirmed.

For the above reasons, the decision of the trial court is affirmed.

Affirmed.

HARTMAN and BILANDIC, JJ., concur.