THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WARREN MURDOCK, Defendant-Appellant.

First District (2nd Division)   No. 1—92—1045

Opinion filed April 5, 1994.

Rita A. Fry, Public Defender, of Chicago (Ronald P. Alwin, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Rebecca Davidson, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Warren Murdock was charged by indictment with the August 22, 1989, murder of Marina Justice which occurred during the course of a robbery in which he took her purse without authority. The following evidence was adduced at his trial or at hearings held on the multiple pretrial motions he filed.

Sally Jones testified that at approximately 8:15 a.m. on August 22, 1989, she was phoning her employer from a pay phone located at the corner of Race and Ohio Streets in the City of Chicago when she noticed an individual walking up Ohio Street, approaching her from the west. From her vantage point, she had an unobstructed opportunity to observe the individual and she noted that he was a very dark-

complected male, with long dark hair, who was wearing a red shirt, dark pants and a hat; that he was approximately 28 to 30 years old; and that he carried a black umbrella.

While she waited for someone at her employer's office to answer her phone call, the individual passed her and continued walking west. She let the phone ring for about a minute but no one answered; in the meantime, the individual had reached the end of the block, turned around and again walked toward her. Jones sensed his presence as he neared her and she turned to look at him. This time she clearly saw his face and recalled that he was tall with a medium build. Soon thereafter he attacked her and attempted to take the purse she carried.

At trial, she identified defendant as being the person who assaulted her. She testified that she tried to fight him off, during which she was able to scratch his face, but she ultimately fell to the ground, still clutching her purse. Although she continued to struggle on the ground with defendant, he was finally able to pull the purse from her grasp and fled with it.

Jones chased after him, and by throwing her shoe at him she forced him to drop the purse as he continued to flee. She recovered her purse, ensured that it still contained her money, and immediately called police to report the crime. Six days later she was called to the police station, where she viewed a lineup and identified defendant as being the person who had attempted to rob her.

Defendant moved *in limine* to exclude the evidence concerning his alleged robbery of Jones and that of another State witness, Pearl Patton, arguing that these incidents were other crimes evidence unrelated to the instant crime and thus were inadmissible. The court denied the motion and allowed the State to offer evidence of both crimes.

Frank DuBose, who was a neighbor of the murder victim, testified that on August 22, 1989, around 9 a.m., he was walking west on Midway Parkway from his home toward the home of a friend. The day was overcast with a slight drizzle, and the pavement was damp. As he walked, he observed the victim, whom he had known for two or three years, as she exited her home on the opposite side of Midway Parkway about 100 feet to his front, and he recalled that she carried a black umbrella. The victim's estranged husband had earlier testified that she worked downtown and took the Lake Street elevated train to work, catching it at the Austin Boulevard station.

DuBose mounted the front stairs of his friend's home and rang his doorbell. His friend did not respond for some time and as he waited, DuBose looked around the neighborhood and noticed an indi-

vidual wearing a red T-shirt, black, soiled pants and carrying a black umbrella, who was walking some distance behind the victim. Although he could not discern his facial features with any degree of precision, he did recognize that the man was very dark skinned, approximately 6 feet tall with thick hair combed straight back, and DuBose roughly estimated his age to be 22 to 30 years old. DuBose identified defendant for the record as the individual he had seen walking behind the victim.

DuBose left the porch, walked to the sidewalk and watched defendant as he was walking away. DuBose did so out of concern for the victim. After he saw that she neared Austin Avenue, a busy thoroughfare, he went into the home of his friend, who had opened the door some time before.

That morning Penny Ford, another neighbor of the victim, left her home on Midway Parkway at about 9 a.m. to take her three sons to their pediatrician. On her way to the Lake Street rapid transit station at Austin, she saw a person lying on a driveway, approximately one-fourth of a block east of Austin. She called to the prone figure, but the victim's labored breathing was the only response she received. Near the body she saw a pair of glasses and a broken umbrella. Soon the police and paramedics arrived, provided emergency treatment to the victim at the scene and then transported her to a nearby hospital, where she died.

Dr. Mary Jumbelic, a forensic pathologist with the Cook County medical examiner's office, performed an autopsy of the victim which disclosed that she had died due to craniocerebral injuries which resulted from blunt trauma to the skull. Jumbelic opined that an umbrella could have been the blunt instrument which delivered the trauma to the head. She added that even though she could not confirm with absolute certainty that an umbrella was the precise instrument used to deliver the fatal blow, she was confident that the death was properly classified as a homicide.

On August 28, 1989, Pearl Patton was walking with her granddaughter when a tall black man, weighing about 160 or 170 pounds, whom she later identified as defendant, stole her purse about a mile from where the victim was slain. Defendant fled down a nearby alley as Patton called for the police, and Chicago police officer Kevin O'Rourke arrived a very short time later. After learning of the robbery and getting a description of the person who snatched her purse, O'Rourke testified that he drove around the neighborhood with Patton and her granddaughter in his squadrol, looking for the robber. After a while, Patton saw defendant and pointed him out as the man who had taken her purse from her. O'Rourke arrested him

and performed a custodial search, during which he found items which had been in Patton's purse. He also confiscated a screwdriver which defendant carried in his hand immediately prior to his arrest.

O'Rourke had defendant transported to the Fifteenth District station house, and after learning that detectives at Area Five headquarters were investigating a series of other purse snatchings, O'Rourke arranged to transfer defendant to Area Five, where he was left in one of its interrogation rooms. Detective Schak of Area Five's violent crimes division testified that he was assigned to investigate the homicide of Marina Justice, and that on August 28, 1989, after speaking to O'Rourke, he proceeded to the Fifteenth District station house, where he saw defendant seated, and concluded that he matched the description of the suspected assailant in the Justice case. Thereafter, Schak went to the home of DuBose, requesting that DuBose accompany him to Area Five headquarters. DuBose testified that prior to Schak's arrival, he was telephoned by an unknown police officer, who asked if he would be available to view a lineup. Once at Area Five, Schak sat with Dubose, interviewing him in the squad room instead of his office because it was occupied by others at the time. In the middle of their conversation, DuBose suddenly exclaimed "that is the man I saw following Marina down the street," pointing to defendant, who was being escorted through the front entrance of the station.

Defendant moved before trial to suppress this identification, arguing that it was the product of a contrived encounter and, as a result, was unduly suggestive, a motion which the trial court denied. Defendant was placed in a lineup where Sally Jones identified him as the person who had robbed her on the morning of August 22, 1989, and Frank DuBose again identified him as the person who pursued the victim immediately before her death.

After the lineups, Schak, along with Detectives Smitka and Jack, interrogated defendant, during which questioning he initially denied any knowledge of the Justice murder. At some point in his interrogation, defendant consented to a search of the apartment he shared with his mother, and during the search, the police confiscated a black umbrella hanging on a hook in the entry hall which was similar to the one found beneath the victim at the scene of the crime.

Schak eventually renewed his interrogation of defendant, who again protested his innocence. Schak advised him that Sally Jones had accused him of robbing her and had picked him from the lineup as the robber. Defendant, in response, admitted to that crime. Next, the officer showed him the umbrella from his home, telling him that it matched the one found at the scene. Schak also informed him that

his mother had told the officers searching his apartment that he owned another umbrella which looked just like it, which was missing from their home. After a pause, defendant confessed that following a struggle, he robbed the victim and left her as she was falling to the ground. His confession was later reduced to writing, which he signed.

The jury found defendant guilty of murder and robbery. Given his extensive criminal record, the court found him to be an habitual criminal, sentencing him to life imprisonment.

## I

The first issue on appeal concerns the State's presentation of evidence which tended to show that, in addition to the robbery which preceded and led to the murder of the victim, defendant committed similar strong arm robberies, *i.e.*, using force to steal the purses of Sally Jones and Pearl Patton. These crimes took place in the general vicinity of the robbery at issue. The robbery of Jones occurred approximately 45 minutes before the instant offense, and the one against Patton happened six days thereafter. As previously noted, defendant brought a motion *in limine* seeking to exclude this evidence.

Evidence of crimes committed by a defendant which are distinct from the one for which she is being tried is inadmissible if offered only to show the defendant's propensity for criminality. (*People v. Thingvold* (1991), 145 Ill. 2d 441, 452, 584 N.E.2d 89, 93.) Our supreme court has observed that "[t]he law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342, 125 N.E.2d 506, 509; accord *Thingvold*, 145 Ill. 2d at 452, 584 N.E.2d at 93 ("[Other crimes] evidence overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment").)

If probative of a specific issue which is relevant to the resolution of the case, however, the court may receive such evidence. (*People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *Lehman*, 5 Ill. 2d at 342-43, 125 N.E.2d at 509.) For example, evidence of prior crimes may be offered in order to show "motive, intent, identity, absence of mistake or accident or the existence of a common design or plan or *modus operandi*." (*People v. Jones* (1993), 156 Ill. 2d 225, 239, 620 N.E.2d 325, 330; see also *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489, 493.) Like all other questions concerning the admissibility of evidence, the decision to admit "other crimes" evidence is within the discretion of the trial court, the exercise of which will not be reversed unless there is a clear showing of abuse. *People v. Patton* (1992), 230 Ill. App. 3d 922, 595 N.E.2d 1141; *People v. Smith* (1990), 199 Ill. App. 3d 839, 557 N.E.2d 596.

It would appear that the State introduced evidence of the other crimes here in order to establish defendant's identity based on an alleged common design shared by the crime for which he was indicted and the other two purse snatchings it sought to prove. Our supposition is premised on instruction No. 13, which was a modified version of Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992). That instruction, which was tendered by the State and given by the court, informed the jury that it could consider the other offenses "solely to demonstrate a common scheme to prove the defendant's identification."

•1 By allowing the State to use the other crimes for the particular purpose of showing a common scheme, the circuit court abused its discretion. The supreme court recently explained in *Jones,* quoting this court's decision in *People v. Rose* (1990), 198 Ill. App. 3d 1, 555 N.E.2d 414, that the common design or scheme exception to the "other crimes evidence" rule "refers to a criminal scheme of which the crime charged is only a part." (*Jones,* 156 Ill. 2d at 239, 620 N.E.2d at 330; see also *People v. Maness* (1989), 184 Ill. App. 3d 149, 539 N.E.2d 1368.) In *Jones,* the court held that two separate rapes could not be considered parts of a larger crime, but instead were simply independent instances of criminality, each distinct from the other. Here, there is nothing to suggest that the three separate purse snatchings were the component parts of one larger criminal enterprise. Instead, like the two rapes in *Jones,* these crimes were independent, unrelated occurrences.

We are not unmindful that in *Jones,* although the court held that the other crimes evidence was incompetent to establish a common design or scheme, it nevertheless found no error in the admission of the evidence. In that case, however, the breadth of the instruction given to the jury allowed it to consider the evidence for a proper purpose, *viz.,* to establish the defendant's *modus operandi,* as well as for an improper one, *i.e.,* common design; accordingly, in affirming the trial court, the supreme court relied upon the correct use it was possible for the jury to have made of the evidence. But in the case at bar, the trial judge, by giving an instruction which by its terms limited the jury's contemplation of the "other crimes" evidence "solely to demonstrate a common scheme," not only allowed, but in fact, ordered the jury to consider the "other crimes" evidence for a unique and particular purpose for which such evidence was inappropriate. Therefore, the conclusion is inescapable that the trial court abused its discretion when it allowed the State to use the evidence of the other crimes for the reason outlined in the State's instruction No. 13. See *People v. Morgan* (1987), 152 Ill. App. 3d 97, 504 N.E.2d 172.

Notwithstanding the fact that the court allowed the State to use the other crimes evidence for a purpose for which it was not proper, reversal of defendant's conviction on this ground is not required in light of his failure to establish any prejudice resulting therefrom. Here, even ignoring the improper other crimes evidence, the State introduced substantial evidence of defendant's guilt. DuBose testified that he observed defendant approach the victim carrying an umbrella with which he may have delivered the fatal blow to her head, and an umbrella matching the description given by DuBose of the one defendant was carrying as he walked behind the victim was found beneath her. More important, defendant confessed that he stole the purse from the victim and after he wrested it from her, he left her as she fell to the ground.

From this evidence, the jury could have reasonably inferred that, in order to gain possession of the purse, defendant struck the victim on the head with his umbrella, which blow proved to be fatal. In view of the impressive weight of this evidence of defendant's guilt, we conclude that he was not harmed by the improper admission of the other crimes evidence; thus, his conviction need not be reversed. See *People v. Scott* (1990), 194 Ill. App. 3d 634, 551 N.E.2d 634 (holding that erroneous introduction of other crimes evidence is harmless where State's other evidence established defendant's guilt beyond a reasonable doubt); see also *People v. Richardson* (1988), 123 Ill. 2d 322, 528 N.E.2d 612; *People v. Chapin* (1992), 233 Ill. App. 3d 28, 597 N.E.2d 1250.

## II

Defendant next contends that a reversal of his conviction is in order because the trial court erroneously denied his motion to suppress the one-on-one station house identification of him made by the State's witness, Frank DuBose. He argues that DuBose's first identification was impermissibly suggestive, thus tainting his subsequent lineup identification as well as the in-court identification he made for the benefit of the jury. Defendant maintains that since the court incorrectly failed to find the initial procedure suggestive, it did not require the State to prove the reliability of DuBose's subsequent identifications; therefore, all of the identifications must be considered unreliable, thus necessitating a new trial.

The one-on-one confrontation between a suspect and a witness has been suspiciously viewed by the courts because it carries with it a substantial likelihood of producing a result induced by the suggestiveness of the procedure used. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152; see also *Stovall v. Denno* (1967), 388

U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (holding that due process is denied when the police use a single-suspect showup identification).) But "not every viewing of a suspect *** alone will be considered a denial of due process, for there may be justifying or saving circumstances." *Blumenshine*, 42 Ill. 2d at 512, 250 N.E.2d at 154.

This court has held that an inadvertent or accidental encounter between a witness and a suspect is the type of exigency mentioned in *Blumenshine* which excuses an otherwise impermissible one-man showup. To fall within this exception, the identification which results from such an unplanned encounter must be immediate, spontaneous, unprompted and positive. (*People v. Braxton* (1980), 81 Ill. App. 3d 808, 816, 401 N.E.2d 1062, 1068.) For instance, in *People v. Jones* (1983), 116 Ill. App. 3d 233, 451 N.E.2d 1358, the victim of an attempted murder, a police officer, came upon his suspected assailant, who was being held in the station house. The officer promptly indicated to other policemen in the room that the defendant was the individual who had attempted to kill him. We held that the trial court properly allowed the identification, the record having failed to show that the witness knew that the perpetrator would be in the squad room or that he was otherwise induced to point out his assailant.

In *People v. Lutz* (1982), 103 Ill. App. 3d 976, 431 N.E.2d 753, the defendant was being taken through a police station when he was spotted by the victim of a robbery who accused him of committing the crime. The witness was not told that he would see the suspected robber, nor did any officer prompt his identification; instead, he blurted out his accusation as soon as he eyed the defendant. This court affirmed the trial court's refusal to suppress the identification, finding persuasive its immediacy, spontaneity and its lack of any reservations.

■ Here, DuBose was seated at the desk of one of the investigating officers, providing a statement when other officers brought defendant into the station house. Without anything being said to prompt him, DuBose informed the officer to whom he was speaking that the offender was walking past them—that defendant was the man he had seen walking behind the victim and carrying the umbrella. His identification was unequivocal and occurred immediately upon seeing defendant. As was true in *Lutz*, the instantaneous and unsolicited nature of his designation of defendant as the suspect strengthens its believability.

Defendant argues that the confrontation here was too fortuitous to be believed and therefore the police should be deemed to have staged the encounter, a charge which Detective Schak and the other

officers denied at the suppression hearing. An example of such an impermissibly manufactured confrontation was presented in *People v. Hatcher* (1977), 45 Ill. App. 3d 374, 359 N.E.2d 1157, in which case the victim of an armed robbery was called to the station house under the pretext of viewing mugbooks. The suspect was seated at a desk which was adjacent to the path the victim would traverse. The victim testified that later an officer asked her if she recognized the man seated at the desk. Despite the contrary contentions of the State, the court doubted that the encounter was by chance, especially in view of the fact that the officer who called the witness to the station was the same one who had placed the defendant in the advantageous spot from where he could be seen. (See also *People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801 (rejecting the State's contention that a confrontation outside the hospital where the victim was taken for treatment was coincidental in light of the fact that while the defendant was in the back seat of their squad car, the officers parked in front of the door from where they knew the victim would be exiting, and that the only thing which explained their chosen parking spot was their desire to precipitate an identification by the victim).) Those cases share no similarity with the case at bar.

Too, defendant's argument asks us to substitute our assessment of the credibility of the police witnesses for that of the trial court, a task for which the judge who heard and observed them testify was better suited (*People v. Saunders* (1991), 220 Ill. App. 3d 647, 580 N.E.2d 1246), and who expressly found that there was "[no]thing untoward about the circumstances of [DuBose's] viewing[ of defendant]. I find [the confrontation to be] accidental ***." The circuit court's determination of the proper weight to be given to the testimony provided at a suppression hearing should not be interfered with unless manifestly erroneous. (*Saunders*, 220 Ill. App. 3d at 668, 580 N.E.2d at 1259; see also *People v. Trask* (1988), 167 Ill. App. 3d 694, 521 N.E.2d 1222.) That certainly may not be said here. Inasmuch as defendant has not carried his burden of showing that the pretrial identification procedure was unduly suggestive (*People v. Wolf* (1977), 48 Ill. App. 3d 736, 363 N.E.2d 402; *People v. Witherspoon* (1975), 33 Ill. App. 3d 12, 337 N.E.2d 454), we conclude that the court did not err in either declining to suppress the identification outright or in failing to compel the State to establish its reliability.

### III

Defendant's third assignment of error challenges the trial court's overruling of his objection to a portion of the testimony of Detective Schak which concerned his interrogation of defendant. Schak was re-

lating what had transpired subsequent to defendant's having confessed to taking the purses of the other two women, after which Schak showed him two umbrellas. He told defendant that one of the umbrellas, which was bent, was found at the scene of the crime. He testified that he next explained that the other umbrella, which matched the first in appearance, was obtained from his apartment during the search to which defendant had consented. Schak further informed defendant that while searching his apartment, the officer learned from defendant's mother that the umbrella he found belonged to her son, and that defendant had another one similar to it which was missing from the home. Defendant objected to this question and was overruled.

On appeal, defendant argues that his mother's statement concerning his ownership of the umbrellas was inadmissible hearsay and therefore the court erred in allowing the jury to hear it. It is second-year law school core curriculum that hearsay is an out-of-court statement offered to prove the truth of the matter asserted. (*E.g., People v. Lawler* (1991), 142 Ill. 2d 548, 568 N.E.2d 895.) If not offered for its truth, an extrajudicial statement may be received in evidence. *People v. Simms* (1991), 143 Ill. 2d 154, 572 N.E.2d 947. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.5 at 576-83 (5th ed. 1990) (explaining the various ways in which an out-of-court statement would be used other than to prove the truth of the assertion therein).

The State argues that it did not elicit the statement of defendant's mother in order to prove that he owned the umbrella which was discovered in his home or that he owned one that resembled it, which was missing. It asserts instead that it offered the statement for the effect it had on defendant and in order to explain why he ultimately admitted to robbing the victim.[1] We have held that if offered to show resultant effects on the hearer, such out-of-court statements do not

---

[1] Defendant argues on appeal that this explanation constitutes a *post-hoc* rationalization on the part of the State, created for the purpose of this appeal. He suggested at oral argument that if, at trial, the State were truly offering this evidence to show its resultant effect on defendant, it had an obligation to apprise the jury of the permissible use of this evidence. However, it has long been the rule of this jurisdiction that

> "[w]hen evidence is admissible for one purpose but improper for another, it should be received and the opponent, if desired, has a right to an instruction limiting the extent to which, and the purpose for which, the jury may consider such evidence. When the opponent fails to request an instruction, the usual rule is that the one who fails to make the request cannot thereafter complain

constitute hearsay. (See *People v. Kline* (1980), 90 Ill. App. 3d 1008, 414 N.E.2d 141.) In *People v. Matthews* (1990), 205 Ill. App. 3d 371, 562 N.E.2d 1113, we applied that rule to a situation where a policeman testified that he told the defendant during interrogation that the exculpatory account he had given to the police concerning his actions on the night of the crime was not corroborated by his alleged alibi witness. On appeal, the defendant alleged that the State had proffered inadmissible hearsay, allowing the fact finder to learn that his earliest story had been disputed. This court disagreed, finding that the value of the testimony was not in the disputation of the alibi, but in the fact that the defendant was informed that his tale was not confirmed.

■ That is also true here. The statement at issue was not being used to prove that defendant owned an umbrella, but rather to explain why he suddenly switched his position on the Marina Justice robbery from protesting his innocence to admitting his commission of the offense, thus adding to the trustworthiness of his confession. (See *People v. Harris* (1990), 204 Ill. App. 3d 491, 561 N.E.2d 1361 (holding that a police officer did not give hearsay testimony when he informed a jury that he told the defendant that his codefendant had confessed to the crime; this testimony merely bolstered the witness' credibility and provided the context of the defendant's subsequent confession).) Since the statement in the instant case was not offered for its truth, it was not hearsay; as a result, the court did not err in allowing the State to elicit it from its witness.

## IV

Defendant finally takes issue with the assistant State's Attorney's conduct during argument when he intimated that prior to striking the victim with his umbrella, defendant placed a screwdriver in it in order to augment her injuries. He urges that this denied him due process and mandates reversal of his conviction. The prosecutor's precise words were:

> "Now you are allowed to draw whatever reasonable inferences you care to draw from the evidence you have heard. You can add two and two. You don't have to just look at the two next to each

---

of its absence." (*People v. Howell* (1977), 53 Ill. App. 3d 465, 471, 368 N.E.2d 689, citing *People v. Chupich* (1973), 53 Ill. 2d 572, 579, 295 N.E.2d 1, 5.)

(Accord *People v. Laster* (1952), 413 Ill. 224, 108 N.E.2d 421.) Consequently, since defendant did not tender or seek an instruction limiting the jury's use of this evidence, he will not be heard to complain that he was unfairly deprived of such an admonition.

other. You will remember, I believe, that the Defendant on his arrest either had in his hand or had dropped to ground, I can't remember exactly what Officer O'Rourke said, People's Exhibit No. 21 for Identification which is a screwdriver.

Now what this has to do with murder I don't know. Maybe nothing. It would seem to me and it may seem to you if that's an inference you want to draw that such a screwdriver placed inside such an umbrella—."

Defendant then objected and was sustained, after which the prosecutor stated:

"In any event, you can draw your own inferences, whatever inferences you choose to make."

. During summation, it is well within the bounds of propriety for the prosecutor to ask the jury to draw inferences from the evidence presented which are favorable to the State. (*People v. Bennett* (1987), 159 Ill. App. 3d 172, 511 N.E.2d 1340.) " 'An argument based upon the facts appearing in the proof or on legitimate inferences deducible therefrom is proper.' [Citations.]" *Bennett*, 159 Ill. App. 3d at 181, 511 N.E.2d at 1346.

■ Here, defendant was carrying a screwdriver when he was arrested moments after he had allegedly committed a strong-armed robbery. He was being tried for a similar robbery which he had committed six days before his arrest. It could be deduced that while committing a similar crime that day, he carried the screwdriver for the purpose of that robbery as well. From that, the jury could have concluded that he placed the screwdriver in the umbrella he carried to add heft to it, making it more effective as a weapon. Since the prosecutor's statements were reasonably inferable from the evidence, they do not support reversal of defendant's conviction on the ground of prosecutorial misconduct. (See, *e.g.*, *People v. Armstrong* (1993), 244 Ill. App. 3d 545, 614 N.E.2d 427; *People v. Beauford* (1991), 249 Ill. App. 3d 943, 621 N.E.2d 1.) Moreover, given the weight of the evidence establishing defendant's guilt, the statements of the assistant State's Attorney were not "so prejudicial that they constituted a material fact in defendant's conviction or resulted in substantial prejudice." (*People v. Johnson* (1984), 122 Ill. App. 3d 532, 539, 461 N.E.2d 585, 590.) Consequently, defendant's conviction will not be reversed on this ground.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

DiVITO, P.J., and McCORMICK, J., concur.